ESTEBAN-TRINIDAD LAW, P.C.
M. LANI ESTEBAN-TRINIDAD, Nevada Bar No. 006967
4315 N. Rancho Drive, Ste. 110
Las Vegas, Nevada 89130
Telephone: (702) 736-5297
Facsimile: (702) 736-5299

Attorney for Plaintiff,
THEODORE PAVLIK

**UNITED STATES DISTRICT COURT**
**DISTRICT COURT OF NEVADA**

| | |
|---|---|
| THEODORE PAVLIK, an individual;<br>    Plaintiff,<br><br>vs.<br><br>UNITED AIRLINES, INC., a foreign corporation,<br>DOES 1 through 10 inclusive;<br>ROES CORPORATIONS/ENTITIES 1 through 10 inclusive,<br>    Defendants. | Case No:<br><br>**COMPLAINT**<br>***(JURY TRIAL DEMANDED)*** |

Plaintiff THEODORE PAVLIK for his causes of action against the above-named Defendants, complains and alleges as follows:

## I.
## INTRODUCTION

This is a workplace disability discrimination case. Defendant wrongfully terminated Plaintiff's employment pursuant to an attendance policy, which as applied, discriminates against individuals because of their disability or illness. This policy of assessing "points" against an employee's record for days when they are unable to attend work because they require a reasonable accommodation of some time off, wrongfully penalizes an employee because of their illness and disability. This is what Defendant did in Plaintiff's case. Plaintiff suffered a series of ailments in a span of time. Defendant then terminated Plaintiff's employment because Defendant alleged that she had been issued too many

-1-

points for missing work due to his illness under a four level policy. To make matters worse, Defendant effectively deprived Plaintiff of his right to talk Family Medical Leave Act ("FMLA"). Plaintiff believes that Defendant's policy is discriminatory, as applied, and that Defendant wrongfully terminated Ms. Raymond's employment in violation of applicable state and federal laws.

## II.
## GENERAL ALLEGATIONS

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1331 as this matter involves a federal question. This is an action brought under the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 1211-12117 and the Family Medical Leave Act (FMLA), 29 U.S.C. §§ 2601-2654. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367(a)

2. Venue is proper in this District because a substantial part of the events and/or omissions giving rise to the claim occurred in the State of Nevada, and Defendant resides in the State of Nevada. 28 U.S.C. §1391(b)(1)-(2).

3. Plaintiff THEODORE PAVLIK is and was, at all times relevant herein, and at time of filing this lawsuit, an individual presently residing in the State of Nevada, Las Vegas, Nevada, Clark County. Plaintiff was an "employee" and a "qualified individual" with a disability under 42 U.S. §12112, for the purposes of this action.

4. Upon information and belief, Defendant UNITED AIRLINES, INC., is and was, a foreign corporation, at all times relevant to herein, a corporation doing business in the State of Nevada, Las Vegas. Defendants, and each of them, are "covered entities" under the ADA and/or an "employer" under NRS §613.310(2), 42 U.S.C. §12112 *et. seq.* for purposes of this action. Defendant has over 15 employees.

5.  Plaintiff timely files this suit following receipt of Right to Sue Letter from the Equal Employment Opportunity Commission (EEOC). Plaintiff complied with all of the administrative requisites of the Nevada Equal Rights Commission (NERC) and/or the EEOC to file suit against Defendant, under NRS §613.310, *et. seq.,* and applicable federal laws.

6.  Upon information and belief, and at all times relevant hereto, Defendants named and/or fictitiously named, and/or other names, or each of them, were the agents, ostensible agents, servants, employees, employers, alter-egos, partners, co-owners and/or joint venture's of each other and of their co-Defendants, and were acting within the color, purpose, and scope of their employment, agency, ownership, and/or joint ventures, and by reason of such relationships, the Defendants, and each of them, are jointly and severally responsible and liable for the acts or omissions of their co-Defendants, as alleged herein. The true names and capacities whether individual, corporate, associate or otherwise of Defendants DOES I through X, inclusive, are unknown to Plaintiff who therefore sues said Defendants by such fictitious names. Plaintiff is informed and believes and therefore, alleges that each of the Defendants designated herein as a DOE is legally responsible in some manner for the events and happenings herein referred to and legally caused injury and damages proximately thereby to Plaintiff as herein alleged. Plaintiff is informed and believes and thereon alleges that Defendants participated in, ratified and/or condoned the acts complained of in Plaintiff's Complaint and the subject matters of this action.

### III.
### FACTUAL ALLEGATIONS

### BACKGROUND

1.  In or about, February, 1999, Defendant hired Plaintiff as a Flight Attendant.

2. On or about September 11, 2001, Defendant placed Plaintiff on leave due to cut-backs and resulting furloughs.

3. Plaintiff returned to work for Defendant in or about April of 2002.

4. In or about January 2003, Plaintiff agreed to take part in a voluntary furlough for twenty-four (24) months.

5. In or October 2003, Plaintiff officially returned to work for Defendant.

6 Throughout his employment with Defendant, Plaintiff received multiple letters from passengers commending him for his good service. Plaintiff has also received written praise from his colleagues and fellow flight attendants. Plaintiff performed his job well.

## PLAINITFF'S HEALTH BEGINS TO DECLINE

7. In or about 2006, Plaintiff began experiencing anxiety, panic attacks and reoccurring colds. Plaintiff applied for FMLA coverage and was given permission to take one (1) to four (4) FMLA-approved sick days per month.

## DEFENDANT IMPLENTS POLICY OF PENALIZING EMPLOYEES WHO TAKE SICK TIME OFF

8. Under Defendant's policy, employees are not to come to work if they are sick or ill, for any reason. However, in or about May of 2006, Defendant and its union agreed to implement a new disciplinary system using points (hereinafter "Points Policy"). This decision was rendered without member voting.

9. Under this Points Policy, in regard to absences due to illnesses not covered under FMLA, there would be a system comprised of four (4) levels. Each absence (or "occurrence") was to count as two points against an employee in his or her file. If a flight attendant had more than six (6) points or three (3)

"occurrences" in a twelve (12) month period, he or she need to wait another twelve (12) months without accruing more than three (3) points in order to have them removed.

10. Based on the foregoing policy, if an employee obtained twelve (12) points, he or she would need to remain in good standing for two (2) years without reaching eighteen (18) points on his or her record.

11. According to this system, it would be incredibly difficult to remain in good standing for two years if an employee was unable to obtain FMLA coverage or had an illness that was not covered by FMLA.

## PLAINTIFF REAPPLIES FOR FMLA COVERAGE

12. In March or about 2007, Plaintiff reapplied for FMLA coverage.

13. In or about April 2007, Defendant transferred Plaintiff to Chicago O'Hare International Airport.

14. In or about May 2007, Plaintiff's FMLA coverage was finalized after two months. Plaintiff was approved to use FMLA coverage one (1) to two (2) times per month for up to a total of six (6) days.

15. In or about December 2007, Plaintiff again reapplied for FMLA coverage and was again authorized under the same conditions.

## PLAINTIFF DENIED FMLA COVERAGE REPEATEDLY

16. In or about October 2008, Plaintiff again reapplied for FMLA coverage. This time, Plaintiff's FMLA coverage was denied.

17. In or about December 2008, Plaintiff's request for FMLA coverage was denied once again.

18. In or about October 2008, Plaintiff became ill with a bronchial infection and received his first two (2) points in his file for this absence.

19. In December or about 2008, Plaintiff became ill due to the side effects of his prescribed medications and received his second two (2) points in his file for this absence when his FMLA was denied.

## LEVEL ONE POINTS

20.     In or about March 2009, Plaintiff received another two (2) points in his file when he came down with walking pneumonia. At this point, Defendant sent Plaintiff a letter regarding his attendance. This letter also informed Plaintiff that he had accrued six (6) disciplinary points and reached "level one" under the disciplinary system regarding employee absences.

21.     In or about June 2009, Plaintiff became ill again due to the side effects of his prescribed medications and received another two (2) points in his file.

22.     In or about June 2009, Defendant offered employees the option to participate in a voluntary furlough. Due to the fact that Plaintiff had been consistently denied FMLA coverage and continued to get ill, he decided to participate in the twenty-two (22) month furlough, scheduled to begin on August 31, 2009 and end June 30, 2011.

23.     When Plaintiff applied to participate in the furlough, Plaintiff received an informational packet. There was no information that identified an employee's work history as a factor that would affect his or her ability to participate in the furlough.  Upon information and belief, furlough time would count towards two years of good standing and that he would need to remain employed and have points removed from his file.  Plaintiff believed that, so long as he did not accrue more points between his return in June 2011 and August 2011, the points on his employee record would be removed.

## LEVEL TWO POINTS

24.     On or about July 2009, Plaintiff was absent from work twice due to illness. As a result, he received four (4) points in his file. At this point, Plaintiff received another attendance letter from Defendant. This letter also informed Plaintiff that he had accrued ten (10) disciplinary points and reached "level two" under the disciplinary system regarding employee absences.

25.     In or about August 2009, just two weeks before Plaintiff was scheduled to begin his participation in the voluntary furlough, he fell ill with strep throat. Plaintiff was given another two (2) points in his file. At this point, Defendant issued Plaintiff a total of fourteen (14) disciplinary points in his file.

26.     At this time, Defendant told Plaintiff that eligibility for FMLA coverage required that a Flight Attendant accrue approximately four hundred and twenty (420) flight hours within the last twelve (12) months. It was already foreseeable that it was going to be impossible for Plaintiff to meet this criteria upon his return to United after being out on voluntary furlough for twenty-two (22) months.

### PLAINIFF DIAGNOSED WITH HIV/AIDS

27.     In or about October of 2009, Plaintiff became was ill again. He was experiencing several bouts of sore throats. After a physician examination and tests, Plaintiff learned he was HIV positive and affected with the AIDS virus. Plaintiff immediately sought treatment.

### PLAINITFF RETURNS TO WORK; HIS HEALTH CONTINUES TO DECLINE

28.     In or about January 2011, Plaintiff relocated from North Carolina to Las Vegas, Nevada. Plaintiff's new base location became the Los Angeles International Airport.

29.     By April 2011, Plaintiff had undergone HIV/AIDS treatment for eighteen (18) months. Plaintiff's physicians cleared him to return to work in July 2011. Plaintiff anticipated returning to United. Plaintiff knew that he would need to accrue four hundred and twenty (420) hours to receive FMLA coverage. What Plaintiff did not know was that his time on voluntary furlough did not count towards his time on "good standing" with United and that no points had been removed from his file.

30.     In or about July 2011, Defendant transferred Plaintiff to Washington Dulles International Airport in Virginia. He remained at this base for approximately thirty (30) days. Plaintiff then transferred back to Los Angeles International Airport.

31. By August 2011, Plaintiff started to became ill due to the side effects of his prescribed medications. Defendant penalized Plaintiff for being ill by assessing another two (2) points for his illness related absence.

### LEVEL THREE POINTS

32. In or about September 2011, Plaintiff missed a three-day trip for United employees because of illness due to the side effects of his prescribed medications. Defendant penalized Plaintiff by assessing another two (2) points for missing this trip. That same month, Plaintiff received a third letter from Defendant regarding his attendance. At this point, Plaintiff had a total of eighteen (18) disciplinary points in his file and reached "level three" under the disciplinary system regarding employee absences.

33. In or about December 2011, Plaintiff was absent from work once again because of illness again due to the side effects of his prescribed medications. Defendant penalized Plaintiff for being ill by assessing him another two (2) points in his file.

### PLAINITFF DENIED FMLA AND IS INFORMED HIS JOB IS IN JEOPARDY

34. In or about March 2012, Plaintiff missed another three-day trip for United employees due to illness. Defendant penalized Plaintiff with another two (2) points in his file.

35. As with each time he missed work for illness and then returned, Plaintiff returned to work and was able to resume all his work responsibilities and perform his job duties.

### LEVEL FOUR POINTS

36. In or about June 2012, Plaintiff missed five (5) days of work because he was ill from the side effects of his prescribed medications. As a result, Defendant issued Plaintiff another two (2) points in his file. That same month, Plaintiff received a fourth letter from United regarding his attendance. At this point, Plaintiff had a total of twenty-four (24) disciplinary points in his file and reached "level four" under the disciplinary system regarding employee absences.

37. In or about August 2012, Plaintiff applied for FMLA coverage, as it had been over one year since he returned from the voluntary furlough. That same month, Plaintiff fell ill and called in sick again due to the side effects of his prescribed medications, pending United's decision regarding granting him FMLA coverage, Defendant assessed Plaintiff two (2) points in his file for this absence.

38. Defendant took over one month to render its decision regarding Plaintiff's request for FMLA coverage. Ultimately, Defendant denied Plaintiff's request, alleging Plaintiff had only accrued 405 actual flight hours, falling short of the 420 flight hours required for coverage.

39. In or about December 2012, Plaintiff called out of work sick with an ear infection. Defendant issued Plaintiff two (2) points in his file for this absence. Defendant, through Plaintiff's supervisor, told Plaintiff that that he "was teetering on a fine line" and that if he had one more occurrence, Plaintiff would be terminated from employment upon receiving thirty (30) points in his file.

## PLAINTIFF WRONGFULLY TERMINATED FROM UNITED

40. Plaintiff's ear infection continued to worsen. Plaintiff informed Defendant that Plaintiff needed to return to Durham, North Carolina to see his specialist at Duke Medical Center to undergo lab work.

41. On or about February 17, 2013, Plaintiff flew to North Carolina. Upon his arrival, Plaintiff called United's Crew Scheduling department to report that he had gone to see his specialist and was calling out sick for the day.

42. Within two hours, Plaintiff received a telephone call came from his supervisor. Plaintiff explained that he needed to be under his specialist's care and that she would be receiving a doctor's note in regard to his absence from work that day.

## PLAINTIFF DENIED ACCOMODATION REQUEST

43. United's policy was that if a doctor's note was sent within three (3) days and the employee's absence was less than six (6) calendar days, he or she would only receive one and half (1.5) points in his

or her file. Plaintiff's supervisor then ended the call with Plaintiff, only to call Plaintiff back within the hour and insisted that he return to Las Vegas, Nevada to meet with her regarding his absences. Plaintiff replied that returning to Nevada was out of the question, as he was under his doctor's orders. Plaintiff's supervisor continued to call Plaintiff, insisting that he return to Nevada. Plaintiff's supervisor also informed Plaintiff that he was likely going to be fired if he did not return to Nevada right away. Plaintiff became severely emotional and distressed as a result of his supervisor's phone calls and decided to contact United's union in Las Vegas, Nevada.

44. The Union advised Plaintiff not speak to Ms. Gallo nor to call out sick until he was released from his doctor's care.

45. Approximately six (6) days later, Plaintiff's supervisor called Plaintiff and stated that his absence on February 17, 2013 had triggered the placement of two (2) more points in his file. Plaintiff also stated that because Plaintiff had now accrued a total of thirty (30) points in his file, he was likely to be terminated from United.

46. Simultaneously, Defendant denied Plaintiff's request to remain at McCarran International Airport as his base location. Instead, Plaintiff was ordered to transfer back to Los Angeles International Airport. After this mandatory transfer, Plaintiff worked with the United union affiliated with the Los Angeles International Airport.

47. Plaintiff remained on United's "sick list," knowing that he may have to take medical leave at any moment. Then, Plaintiff received his most recent lab results indicating his health was deteriorating quickly, especially in the face of all the stress he was feeling from potentially losing his job. Plaintiff's doctor recommended that he take an official medical leave and remain on it.

48. Plaintiff was informed that if the need for a meeting with United arose, Plaintiff would receive either a telephone call or letter from his supervisor or the union representative. Defendant and the Union

informed that he could not be fired at an in-person meeting between United, the union representative and himself. Plaintiff's doctors repeatedly sent letters to United in justification of his inability to attend such a meeting.

49. In or about July 2013, Plaintiff was first made aware of the existence of United's RAP (Reasonable Accommodation Process) program through a letter sent to him by his supervisor. In this letter, his supervisor provided information about the program, but also broadly assumed that Plaintiff was not interested in the program.

50. Plaintiff applied to the RAP program; Plaintiff had been informed that the application was pending.

51. While his RAP application was pending, Plaintiff thereafter received a Termination of Employment Notice from Defendant via certified letter.

## IV.
## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### DISABILITY DISCRIMINATION
### AMERICANS WITH DISABILITIES ACT ("ADA") 42 U.S.C. §§ 12111-12117, *et. seq.*,
### AND NEVADA REVISED STATUTE §613.310 *et. seq.*

52. Plaintiff repeats and re-alleges each and every allegation made in the paragraphs above, as though set forth fully herein.

53. Plaintiff is a qualified individual with a disability under the ADA.

54. Defendant subjected Plaintiff to adverse and tangible employment actions on the basis of his disability. Defendant denied and/or refused Plaintiff a reasonable accommodation because of his disability.

55. Upon information and belief, similarly situated employees, who did not have a disability, were treated more favorably than Plaintiff and were not subjected to the adverse and tangible employment actions imposed upon Plaintiff by Defendant.

56. By subjecting Plaintiff to disability discrimination, Defendant violated state and federal law, specifically Title VII of the Civil Rights Act, 42 U.S.C. §2000e *et. seq.*; and Nevada Revised Statutes §613.310 *et. seq.*, prohibiting discrimination on the basis of a disability.

57. That, as a direct and proximate result of Defendant's acts and conduct, Plaintiff incurred and continues to incur medical expenses, possible future medical expenses, great pain of body and mind, loss of earnings, loss of earning capacity, loss of enjoyment of life, all to Plaintiff's detriment in an amount to be determined, according to proof at time of trial.

58. Defendant's actions were intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard for the harm caused to Plaintiff.

59. Plaintiff is entitled to all legal and equitable remedies available under state and federal law; Nev. Rev. Stat. §613.310 *et. seq.*; Title VII as a result of the retaliation suffered as a result of Defendant's conduct.

60. As a further result of Defendant's above actions, Plaintiff has been required to engage the services of attorneys and is, therefore, entitled to an award of reasonable attorneys' fees, costs and interest/incurred herein.

## SECOND CAUSE OF ACTION
### FAMILY MEDICAL LEAVE ACT (FMLA) / 29 U.S.C. §§ 2601-2654

61. Plaintiff repeats and re-alleges each and every allegation made in the paragraphs above, as though set forth fully herein.

62. Plaintiff was an eligible employee under FMLA and entitled to FMLA.

63. Plaintiff lawfully exercised and/or attempted to exercise his rights provided under FMLA. Plaintiff's intention to take FMLA leave was given to Defendant.

64. Defendants interfered, restrained and/or denied Plaintiff's attempt to exercise his rights provided under FMLA in violation of 29 U.S.C. §2601-2654.

65. That as a direct and proximate result of Defendants' acts and conduct, Plaintiff incurred and continues to incur, economic damages, great pain of body and mind, medical and future medical expenses, loss of earnings, loss of earning capacity, loss of enjoyment of life, and other damages, all to Plaintiff's detriment in an amount to be determined, according to proof at time of trial.

66. As a further result of Defendants' above described actions, Plaintiff has been required to engage the services of attorneys and is, therefore, entitled to an award of reasonable attorneys' fees, costs and interest/incurred herein.

### THIRD CAUSE OF ACTION
### RETALIATION
### ADA & FMLA
### 52 U.S.C. § 12203(a) *et. seq.* and 29 U.S.C. §§ 2601 *et. seq.*

67. Plaintiff repeats and re-alleges each and every allegation made in the paragraphs above, as though set forth fully herein.

68. Plaintiff complained to Defendant about certain actions that he believed were discriminatory on the basis of his disability and/or on the basis of the use of his FMLA.

69. Shortly after his complaints to Defendant, Plaintiff was issued adverse employment actions in the form of "points" and ultimately terminated.

70. Plaintiff suffered these adverse and tangible employment actions, including his termination, as a direct and proximate result of his complaints of unlawful discrimination under the ADA and or violations of FMLA.

## FOURTH CAUSE OF ACTION
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

71. Plaintiff repeats and re-alleges each and every allegation made in the paragraphs above, as though set forth fully herein.

72. That the conduct of Defendant, its agents, employees, and/or representatives, was extreme and outrageous and done for the purpose of injuring Plaintiff.

73. That the conduct of Defendant, and each of them, its agents, employees and/or representatives were intentional, malicious, willful and/or outrageous, and therefore, constitutes an intentional infliction of emotional distress to Plaintiff, including, but not limited to the following:

(a) Plaintiff's Supervisor repeatedly called Plaintiff on his personal cellphone during a time when Defendant knew or otherwise should have known that Plaintiff has extremely ill and sick leave, demanding that he return to work immediately or be terminated;

(b) The first time Plaintiff met his supervisor in Las Vegas, Nevada, his supervisor told Plaintiff "you are hanging by a thread," and all Plaintiff did was hand his Supervisor a physician's note;

(c) Plaintiff's Supervisor called Plaintiff at home while he was out sick and told him his job was in jeopardy. When Plaintiff started to get emotional on the phone, Plaintiff's Supervisor told Plaintiff that he should just let it go, meaning quit his job.

(d) Plaintiff was subjected to repeated threats that he would be terminated from his job, leading to increased stress and anxiety over possible loss of employment and medical health care benefits;

74. That, as a direct and proximate result of Defendant's conduct, Plaintiff suffered emotional distress which caused, and will continue to cause, Plaintiff severe and extreme mental pain and suffering.

75.  That, as a direct and proximate result of Defendant's acts and conduct, Plaintiff incurred and continues to incur, economic damages, great pain of body and mind, loss of earnings, loss of earning capacity, loss of enjoyment of life, all to Plaintiff's detriment in an amount to be determined, according to proof at time of trial.

76.  That Defendant's conduct constitutes intentional, malicious, willful, and wanton acts, thereby entitling Plaintiff to punitive damages according to proof to be determined at time of trial.

77.  As a further result of Defendant's above actions, Plaintiff has been required to engage the services of attorneys and is, therefore, entitled to an award of reasonable attorneys' fees, costs and interest/incurred herein.

WHEREFORE, Plaintiff prays for the following relief:

1.  Back-pay, front pay, lost benefits, statutory and other recoverable damages, and pre-judgment interest and post-judgment interest;

2.  Compensatory damages, and damages for mental or emotional pain and suffering, as permitted by applicable law, according to proof, to be determined at time of trial;

3.  Punitive and/or other permissible damages, according to proof to be determined at time of trial;

4.  Attorney's fees, expenses and costs of suit; and

5.  Such other and further relief as the Court may wish to entertain.

DATED this 12th day of May, 2015

ESTEBAN-TRINIDAD LAW, P.C.
BY: _____
M. LANI ESTEBAN-TRINIDAD
Nevada Bar No. 006967
4315 N. Rancho Drive, Ste. 110
Las Vegas, Nevada 89130
Telephone: (702) 736-5297
Facsimile: (702) 736-5299
Attorney for Plaintiff,
THEODORE PAVLIK

# JURY DEMAND

Pursuant to Federal Rules of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury as to all issues.

DATED this 12th day of May, 2015.

**ESTEBAN-TRINIDAD LAW, P.C.**

BY: _/s/ M. Lani Esteban-Trinidad_
M. LANI ESTEBAN-TRINIDAD
Nevada Bar No. 006967
4315 N. Rancho Drive, Ste. 110
Las Vegas, Nevada 89130
Tel: (702) 736-5297
Fax: (702) 736-5299

Attorney for Plaintiff,
THEODORE PAVLIK